# Court of Appeals.

## (October 20, 1896.)

## PEOPLE v. WILLIAM W. McLAUGHLIN.

**1. Criminal law—Removal of case.**

Defendant has a right to apply for a removal of the action to another county before trial, upon the ground that a fair and impartial trial cannot be had in the county where the indictment was found.

**2. Same.**

A district attorney, who insists upon proceeding with the trial in total disregard of the right of defendant to secure a removal of the action before trial, does so at his peril, though he first obtains an improper and irregular order, in form, setting aside the defendant's application and stay.

**3. Same.**

Upon the reversal of such irregular order, the decision invalidates the proceedings intermediate the order and its refusal.

**4. Same—Stay.**

The right of a stay of proceedings upon procuring an order for removal of an action before trial is dependent upon the discretion of the judge, to whom application is made.

**5. Same.**

If cause is shown which the judge in his discretion regards as sufficient, a stay may be granted which confers upon the defendant a right which should not be disregarded until the hearing and determination of the application, unless under very exceptional and extraordinary circumstances.

**6. Same.**

The authority to determine the propriety of setting aside such stay is conferred upon the judge to whom the application was originally made.

**7. Same—Procedure.**

The right of removal of criminal actions before trial, and the procedure to be adopted, are provided for and regulated by the Code of Criminal Procedure.

**8. Same.**

A judge of co-ordinate jurisdiction is not authorized to vacate or interfere with such order made by another judge.

**9. Same.**

If application is made to the judge who granted the order, he may, it seems, have authority to vacate or modify it.

10. Same.

Where the appellant is presumptively entitled to the ordinary relief which follows the reversal of an order, the party obtaining such order should not be permitted to retain any benefit derived from it to the disadvantage of the appellant.

11. Indictment—Counts.

The trial court has the right, especially upon the consent of the defendant, to retain the first counts in an indictment for the purpose of explaining the reference contained in the last count.

12. Criminal law—Extortion.

Fear, such as will constitute extortion, may be induced by a threat to do an unlawful injury to the person or property of the individual threatened

13. Evidence—Memorandum.

An original entry or a memorandum made by a witness at the time of a transaction is admissable in evidence, as ancillary to his testimony, only when without its aid he is unable to recollect distinctly the fact to which it relates. Where he has a distinct recollection of the essential facts to which the entry relates, so that primary common law proof may be furnished, the necessity for secondary evidence does not arise, and it is incompetent.

14. Same.

Such memorandum, if admissible, can be received only as evidence of the facts stated therein, and not as to the conclusions it contains. It cannot be admitted to prove the conclusions of the witness, his purpose or the object of another person.

Appeal from a judgment and order of the appellate division of the supreme court in the first department, affirming a judgment rendered in the Oyer and Terminer in and for the city and county of New York, convicting defendant of the crime of extortion; also from an order of the appellate division which reversed an order of the special term, shortening the time for hearing the defendant's application for a change of the place of trial in this action, and which denied such application and vacated the stay of proceedings granted, to enable the defendant to have such application heard and determined.

Edward C. James, Abram I. Elkus and Edward E. McCall, for appellant.

Austen G. Fox and Daniel G. Rollins, for the People.

MARTIN, J.—The appellant for indicted for bribery, and also for the crime of extortion. The indictment contained five counts. The first four were for bribery, and the last for extortion. He was arraigned upon this indictment, and pleaded not guilty. Afterwards he was brought to trial thereon at an oyer and terminer held in and for the city and county of New York for the crime of extortion only. The trial commenced April 15, 1895, and continued until May 11, 1895, when the jury, being unable to agree, was discharged. The court then set the case down for a second trial, to commence on the 20th of the latter month. On May 18th the appellant served upon the district attorney notice of an application to remove the action before trial, to be heard at a special term held in and for the city and county of New York on the 3d day of June, 1895. The motion was upon the ground that the appellant could not obtain a fair and impartial trial in the city and county of New York. It was based upon the affidavit of the defendant, and voluminous papers attached to and forming a part of such affidavit, which tended to show the existence of a general prejudice against the defendant, and that he could not obtain a fair and impartial trial in the city and county of New York. There is nothing in the motion papers or record to indicate that the motion was not made in good faith, or that the defendant was guilty of any laches in making such application. Indeed, considering the volume of papers and their contents, it is evident that the defendant proceeded with diligence and in good faith. The defendant also obtained from a judge of the supreme court an order, staying the proceedings upon the indictment until the hearing and determination of his application. At 7 o'clock on the morning of May 20th, the district attorney served upon the defendant's attorney an order made by Mr. Justice Andrews, requiring the defendant to show cause at a special term to be held by Mr. Justice Ingraham, at 10 o'clock a. m. of the same day, why the time for hearing the defendant's application should not be changed from June 3d to May 20th, and the motion be then and there forthwith made. This order was based upon an affidavit of the district attorney, which, without denying any of the facts set forth in the affidavit of the defendant and the accompanying papers, stated what proceedings had already been had in the

action; that he believed a postponement of the trial would prejudice the public interest; and that he would be ready to proceed with the argument of the motion to remove the action before trial on the 20th of May, at 11 o'clock a. m. At the time mentioned in the show-cause order, the defendant appeared specially for that purpose, and filed objections to the hearing of the motion, which, among others, were that the proceeding for the change of the place of trial was a special proceeding under the statute, and that the supreme court had no power or jurisdiction over it, except such as is given by statute; that the order made by Mr. Justice Andrews was null and void; that he had no power or jurisdiction to make it; that the defendant desired to serve other papers to be used on the application to change the place of trial, that were not, and could not have been, previously prepared; that his counsel could not be present, as he was engaged in the argument of cases in the court of appeals; and several other grounds· apparently sufficient to show that the motion could not be properly made at that time. The defendant then asked to postpone the hearing of that motion, owing to the absence of his counsel. This the court denied. It then directed that the motion on the order to show cause should proceed. The court immediately ordered the defendant to make the motion to change the place of trial then and there. This he declined to do, insisting that he had the statutory right to have it heard at the time for which it was noticed, and that for other reasons stated, which seemed to be sufficient, he was unable to make it at an earlier time. The court then, without any application by the defendant or in any other way having that motion before it, denied the defendant's motion to change the place of trial. After denying the motion, the court also vacated the stay of proceedings granted by Mr. Justice Pratt, without any notice to the defendant. of an application for that purpose. Upon the same day, the defendant appealed from the order of the special term ·to the general term in the first department.

Immediately after the entry of the order granted by the special term, the court of oyer and terminer, which had been awaiting the result of the people's motion, ordered the second trial of this action to proceed. Thereupon, before any proceedings were had in the action, the defendant called the attention of the court to the mo-

tion papers and stay of proceedings which had been indorsed thereon and filed on the preceding Saturday, and objected to the court's proceeding with the trial of the action because that application was pending and the trial stayed. A certified copy of the order of the special term was then procured and filed, and thereupon the defendant's objections were overruled, to which he duly excepted. The defendant's counsel then objected to proceeding with the trial, upon the ground that the order of the special term was illegal and void; that the court had no power to grant it; that the stay of proceedings was in full force and effect; and that the court had no jurisdiction to proceed with the trial in violation of such stay, or to deprive the defendant of his statutory right to have his application for a change of the place of trial heard and determined as provided by law. The court overruled these objections, and the defendant excepted. The defendant then moved for a postponement of the trial, because his senior counsel was engaged in the court of appeals, and read an affidavit in support of that motion. The facts stated in that affidavit were not denied or contradicted, but the court denied the motion, and an exception was taken by the defendant. The following Friday, May 24th, before any juror was sworn, the defendant's counsel, having returned, objected to the swearing of the jurors until the defendant's motion for a change of the place of trial was regularly heard and decided, at the time and place for which it had been noticed. This objection was made upon all the grounds stated in opposition to the motion at special term. The court overruled it, and the defendant excepted. After the jury was selected, but before the case was opened or any evidence given, the defendant's counsel again moved to discharge the jury and postpone the trial, on the ground that proceeding with the trial was in violation of the stay, in derogation and denial of the defendant's right to make an application to change the place of trial; that the order of the special term made May 20th was without jurisdiction, and in violation of the defendant's right, and gave no authority to the oyer and terminer to violate such stay or proceed with the trial; and that an appeal from such order was pending, and no further proceedings should be taken in the action until the hearing and determin-

ation of that appeal. The court denied that motion, and the defendant excepted.

The appellant's first contention is that, upon the reversal of the order of the special term, the appellate division should also have reversed or set aside the intermediate trial and proceedings which resulted in the defendant's conviction. The appellate division unanimously reversed the order, not only to the extent that it denied the defendant's motion to change the place of trial, but also so far as it set aside the stay of proceedings. From that order no appeal has been taken to this court, except so far as necessary to a review of its propriety in not setting aside the proceedings and trial, which took place intermediate the time when such order was granted and when it was reversed. The appellant had a right to apply for a removal of the action to another county before trial, upon the ground that a fair and impartial trial could not be had in the city and county of New York. The right to remove the place of trial from one county to another, where a fair and impartial trial cannot be had in the county where the indictment is pending, has long existed. It existed at common law, and was subsequently incorporated into the statutes of the state. The provisions of the Code of Criminal Procedure upon the subject have been evolved from previous legislation, and, so far as they extend, now contain the rule of law governing such an application. As they stood at the time of the trial, so far as material, they were as follows: " A criminal action, prosecuted by indictment, may, at any time before trial, on the application of the defendant, be removed from the court in which it is pending, as provided in this chapter, in the following cases: * * * (2) From a court of oyer and terminer or sessions, or a city court to the court of oyer and terminer of another county, on the ground that a fair and impartial trial cannot be had in the county or city where the indictment is pending." Section 344. If a former trial has been had, the indictment may be removed before a new trial. Section 345. " The application for the order of removal must be made to the supreme court at a special term in the district, upon notice of at least ten days to the district attorney of the county where the indictment is pending, with a copy of the affidavits or other papers on which the application is founded."

Section 346. "To enable the defendant to make the application, a judge of the supreme court may, in his discretion, upon good cause shown by affidavit, make an order staying the trial of the indictment, until the application can be made and decided." Section 347. That the right thus given is a substantial one, and has always been regarded as of great importance to a defendant, is manifest, not only from the time it has existed, but also from its paramount necessity to fairly protect his just rights and interests. The right of every person accused of crime to have a fair and impartial trial, before an unbiased court and an unprejudiced jury, is a fundamental principle of criminal jurisprudence. For the protection of persons accused of crime, the law, as a safeguard against local prejudice, has benignly provided this remedy. Under the statute, the defendant has an absolute right to apply to the supreme court for a removal of the action before trial, upon the ground relied upon. Of this he has been deprived. Having thus been deprived of a substantial right, and the district attorney having proceeded with the trial of the indictment, which resulted in the defendant's conviction, in defiance of such right, we are unable to perceive any proper ground upon which the action of the appellate division can be sustained so far as it failed to set aside the proceedings and trial, and thus accord to the defendant the benefit of this statutory remedy. The learned district attorney, when he insisted upon proceeding with the trial in total disregard of this right, did so at his peril, although he first obtained an improper and irregular order, in form, setting aside the defendant's application and stay. When that order was reversed, the logical result of the decision was to invalidate the proceedings intermediate the order and its reversal. That such a result would necessarily follow seems obvious, and the district attorney must have understood that the regularity of the trial was dependent upon the validity of the order of the special term.

In this case the right to apply for a change of the place of trial was valueless without a stay. The stay was as important as the right to apply for a removal of the action. The latter right is absolute, while the former is dependent upon the descretion of a judge. Still each is so dependent upon the other as to indicate that the purpose of the statute is that, subject to the descretion of

a judge, the stay shall also be absolute.    It could hardly have been the intention of the legislature to do a useless thing by granting a defendant the right to make an application to remove an action and apply for a stay, and still permit it to be rendered ineffectual in the manner pursued in this case.    Manifestly, the purpose of this statute is to give a defendant the right to make an application for a stay; and, if cause is shown which the judge in his descretion regards as sufficient, a stay may be granted which confers upon him a right which should not be disregarded until the hearing and determination of the application, unless under very exceptional and extraordinary circumstances.    To prevent delay by groundless motions, the legislature provided that such a motion should not delay the trial, unless a judge should deem it proper, and so order.    The authority to determine that question is conferred upon the judge to whom the application is made.    "The general rule is that a party cannot appeal from one judge to another of co-ordinate jurisdiction, by motion for relief, from an order or judgment against him, but must seek his remedy by appeal to a tribunal having appellate jurisdiction in the premises." Kamp v. Kamp, 59 N. Y. 212, 215 ; in re Niagara Falls & W. R. Co., 121 N. Y. 319, 24 N. E. 452.    If this were a proceeding in a civil action, section 772 of the Code of Civil Proceedure might be sufficient to authorize the court to vacate or modify the order. But it was a proceeding in a criminal action, and, by virtue of the provisions of section 962 of the Code of Criminal Procedure, is regulated by that Code, and not by the Code of Cival Procedure. That section provides : "This Code applies to criminal actions, and to all other proceedings in criminal cases which are herein provided for, from the time when it takes effect." The right of removal of criminal actions before trial, and the procedure to be adopted, are provided for and regulated by the Code of Criminal Procedure.    The Code of Criminal Procedure further declares. that "the only mode of reviewing a judgment or order in a criminal action, or special proceeding of a criminal nature, is by appeal."    Section 515.    That section is applicable to judgments, orders, and special proceedings which are provided for tin he Code of Criminal Procedure.    People ex rel. Taylor v. Forbes, 143 N. Y. 219, 38 N. E. 303.    That being the case, we think it doubtful if one

judge of co-ordinate jurisdiction is authorized to vacate or interfere with another order made by another. Where such an application is made before a court presided over by another justice than the one granting the order, it is practically an appeal from one judge of co-ordinate jurisdiction to another, and we find no such appeal provided for in the system of practice governing criminal proceedings in this state. If, however, an application had been made to the judge who granted the order, perhaps he might have had authority to vacate or modify it, on the ground that, as the statute conferred upon him the power to grant it in his discretion, it also contained an implied authority to vacate or modify it. Indeed, that appears to have been the opinion of the learned district attorney, as he subsequently applied to Judge Pratt to vacate the stay, which was denied. In this case the judge who granted the stay provided in the order that the people might be heard upon the question of its propriety. But, instead of availing himself of that provision, the district attorney instituted a proceeding before another judge, which proceeded with severe and surprising celerity, and resulted in a denial of the defendant's rights. The manifest purpose of the statute was to insure the defendant an opportunity of having his application heard before trial, provided a judge of the supreme court should, in the exercise of his discretion, grant a stay. By another section of the Code of Criminal Procedure, a certificate of reasonable doubt by such a judge operates as a stay of proceedings upon appeal. Section 527. Can it be that, where such a certificate is granted, a special term has jurisdiction to set it aside? If not, can it be held that it had jurisdiction to set aside the discretionary stay granted in this case? The purpose of the two provisions is similar. One is to provide for a stay until an appeal can be heard and decided. The other is to provide for a stay until an application can be made and determined.

But it is unnecessary to further discuss the validity of that order, as the appellate division held it to be improper, and reversed it. As that decision is not appealed from, it must be regarded as final on this appeal, and cannot be reviewed by this court, except to determine whether upon its reversal the court should have granted the relief contended for by the appellant. The record

fails to disclose any reason for the omission of the appellate division to grant the defendant the relief to which he was apparently entitled, but the opinion shows that it was not because of the insufficiency of the papers upon which the application was made. That court, in effect, said that the papers were such as to call for serious and careful consideration; that many of them were undoubtedly of great force, and might well have led the defendant to believe that it was doubtful whether an impartial jury could be procured to try this case within the county of New York; and that they were such as called upon the court to whom they were presented to carefully weigh and consider them, if it did not call upon the people to answer or explain them. It then said: "It is apparent from the papers that no such consideration was had." After having, in effect, held that the application o. the defendant was proper, that the defendant was not guilty of laches, that it was made in good faith, and upon papers which required the deliberate consideration of the court, and that the defendant was deprived of such a consideration, for which the order should be reversed, it then held that the defendant had no reason to complain because the case was tried before an impartial jury. How that fact was ascertained it is impossible to determine. There is nothing in the record from which such an inference can be properly drawn. It may well be that, so far as could be discerned from the record, the jury might have seemed to be an impartial one, and yet the defendant have fallen far short of having a fair and impartial trial.

That jurors are sometimes prejudiced, and courts may be unconsciously biased to the injury of one of the parties, must be admitted. Prejudice is often an insuperable barrier to the fair and impartial administration of the law. Its influence is subtle, insidious, and often unconsciously warps the judgment and blinds the intelligence of those surrounded by its atmosphere. But its presence can usually be discovered only from the circumstances and conditions which produce it. In discussing this question in another case it was said: "But there cannot well be any serious misapprehension as to the existence of facts [showing prejudice against the defendant], especially where they are of a public nature. The principal question is as to the inferences to be drawn

from them. It [the trial] is the very thing which the law seeks to avoid, when it is seen that the party may, and probably will, be drawn into a trial by a jury who, under an influence of which they may themselves be hardly conscious,—an influence which, perhaps, no human sagacity can detect,—may pronounce a verdict against him, and conclude his rights forever. Above all would it be dangerous to require that he should risk his trial by a panel selected from a community already sought to be influenced by the course of the press; that very panel being personally appealed to by the opposite party's own press, or one put in motion by him or by some other person." People v. Long Island R. Co., 4 Parker, Cr. R. 602, 604; People v. Webb, 1 Hill, 179.

The papers in this case disclosed that upon the first trial it required three weeks to obtain a jury; that its deliberations were attended by unusual excitement, and even by passion; that those voting for acquittal were threatened with imprisonment by their fellows; that it was reported that, after their discharge, their intelligence, honesty, and motives were assailed in public meetings and by the clergy; and that the public press joined in an attack upon such jurors and upon any prospective jurors who should so vote upon a subsequent trial. These facts and many others are set forth in minute detail in the papers upon which the defendant made his application. They are undenied, and hence, upon this appeal, must be regarded as true. With the condition of affairs set forth in the moving papers, it was impossible, we think, for the learned appellate division to properly determine that the defendant's second trial was fair and impartial. We are unable to discover any process by which that court could determine that there was not an atmosphere of prejudice surrounding the court, and pervading the jury box, which affected, if it did not control, the result. That the papers upon which the motion was made were sufficient to require a court to seriously consider that question, was the unanimous opinion of the appellate division. There is nothing in the record to show that the same condition did not continue and exist at the time of the second trial. On the contrary, if the record discloses anything upon the subject, it serves to corroborate the statements contained in the moving papers. Presumptively, the defendant was entitled to the ordinary relief

which would follow the reversal of the order. As it was invalid, the party obtaining it should not be permitted to retain any benefit derived from it to the disadvantage of the other party. We can find in the record, from which alone this question must be determined, nothing whatever to justify the learned court in refusing to award the defendant the benefit which naturally followed the reversal of the order. We think the court should have set aside the trial and all proceedings intermediate the granting of the order appealed from and its reversal, permitted the defendant to renew his motion to change the place of trial, and stayed the proceedings upon the indictment until it was heard and determined.

The appellant also contends that the court erred in its rulings upon the trial of challenges to jurors: First, in improperly rejecting individual jurors upon the ground of a lack of intelligence, by reason of their failure to sustain certain novel and extraordinary educational tests invented by the prosecution; second, that jurors were improperly rejected for alleged bias; third, that disqualified and biased jurors were accepted and participated in the verdict; fourth, that disqualified and biased juors were accepted, and the defendant was required to use his peremptory challenges to exclude them from the jury; and, fifth, that valid exceptions to the decisions of the court were taken to the admission or rejection of testimony on the trial of challenges for actual bias to jurors who participated in the verdict. An examination of the questions thus raised would necessarily involve the investigation of a great number of rulings made by the trial court. As we have reached the conclusion that the judgment should be set aside and vacated upon other grounds, we are not required to examine the various questions presented by those rulings, as this court has so recently stated the principles and rules relating to challenges of jurors, and how far such questions are reviewable by it, that it is unnecessary to examine the questions presented for the purpose of establishing rules which should control in future cases. In passing, however, it may be said that the tests employed by the district attorney for the alleged purpose of determining the intelligence of jurors were unusual, if not extraordinary. An examination of the record dis closes that the questions asked the jurors were involved, compli cated, and couched in language difficult to be understood by

persons who were not educated in the law. While we deem it unnecessary to determine the question whether the tests thus em- employed raise a question of law for this court to decide, or whether the trial court, by reason of such tests, illegally rejected jurors who should have been permitted to act, yet we think the employment of extraordinary educational tests in the examination of jurors is not to be encouraged. We deem it better that the ordinary procedure in such cases be followed, as a departure from it might lead to errors which would invalidate the trial.

The appellant also urges that the indictment in this case was insufficient, and for that reason the court ought to have dismissed it, and discharge the defendant. As we have already seen, the in- dictment contained five counts, four charging the defendant with the crime of bribery, and the fifth with the crime of extortion. Upon the first trial the district attorney elected to present the case to the jury upon the fifth count of the indictment alone. On the second trial, before the case was opened, the defendant's coun- sel moved to dismiss the indictment, and discharge the defendant, upon the ground that the fifth count was insufficient, because it did not contain the essential elements of the crime of extortion, except by reference to the other counts in the indictment, which were for bribery, and which the district attorney had elected to disregard in the presentation of the case to the jury upon the for- mer trial. That motion was denied, upon the ground that the defendant had, in effect, consented to the retention of the bribery counts for the purpose of reference, that the objection was too late, and that there were no deficiencies in the fifth count of the indictment. To this ruling the defendant excepted. While an indictment must contain every essential element of the crime charged, and the charge must be made directly, and not inferen- tially, yet, under the circumstances of this case, we are of the opinion that the court had the right, especially upon the consent of the defendant, to retain the first four counts for the purpose of explaining the reference contained in the fifth count, and that, when retained for that purpose, the indictment was sufficient. The facts in this case are unlike those in the case of People v. Werbin, 27 Hun, 311. In that case the indictment contained three counts, and, after the jury had retired, a nolle prosequi was

entered upon the first and second counts, whereupon the counsel for the defendant moved for his discharge, upon the ground that the third count was insufficient. The motion was denied, and an exception taken. The general term held in that case that the effect of the nolle prosequi was to strike out the first and second counts, and they became extinct, and, as the third was insufficient, it was error to deny the defendant's motion. In this case the people elected to submit the case to the jury upon the fifth count alone, and, with the consent of the defendant, the preceding counts were retained for the purpose of reference. On the subsequent trial the court refused to strike out the preceding counts, but retained them to explain the reference contained in the fifth count. We think the court had the power to retain such portion of the preceding counts as was necessary to explain the reference contained in the fifth count, and that it properly denied the defendant's motion. We do not, however, pass upon the question whether the retention in the indictment of the counts for bribery entitled the defendant to additional peremptory challenges to jurors, as that question was not raised.

The appellant further insists that the court erred in allowing the people to prove facts relating to other distinct and disconnected crimes, as circumstances from which the jury was permitted to draw an inference that the defendant was guilty of the crime charged in the indictment. The last count of the indictment was for extortion from Francis W. Seagrist, Jr., of the sum of $50 on November 21, 1891. To maintain the action, it was necessary for the people to prove that the defendant had obtained the money from Seagrist with his consent, induced by a wrongful use of force or fear, or under color of official right. Fear, such as will constitute extortion, may be induced by a threat to do an unlawful injury to the person or property of the individual threatened. Pen. Code, §§ 552, 553. On the trial there was no evidence that the defendant had made any threat whatever to Seagrist, or that any money was paid by him to the defendant at the time or in relation to the transaction alleged in the indictment. The evidence of Seagrist was to the effect that he had paid $50 to the defendant, or to Burns, but he was unable to testify to which one he paid it. Thus, upon the evidence of Sea-

grist, there was no direct proof that the defendant had either made the threat, received the money, or had any connection whatever with the crime for which he was indicted and tried. The people sought to overcome this defect by charging the defendant as a principal, under the provisions of section 29 of the Penal Code. The prosecution attempted to establish the defendant's guilt on the theory that, although he neither made the threat nor received the money, he nevertheless aided or abetted Burns in the commission of the crime, or directly or indirectly counseled, commanded, induced, or procured him to commit it. To establish that fact, the people were permitted to prove circumstances and facts relating to other separate crimes or transactions with Seagrist and other persons, in which it was claimed that the defendant and Burns had taken part, previously and subsequently to the offense for which the defendant was tried. From this proof the jury was permitted to infer that Burns and the defendant acted jointly and with a joint criminal purpose in those various transactions, and to further infer therefrom that the defendant and Burns were criminally associatsd in the commission of the crime charged in the indictment. These transactions were: (1) A transaction with Seagrist in August, 1888, in which Burns threatened to stop his work, and told him he could not go on until he saw the captain, and he paid the defendant $50, and was not further molested; (2) a similar transaction with Seagrist in May, 1889, when he paid the defendant $100; (3) a transaction in February, 1890, between Burns and one Chesley, the employer, of the witness Lincoln, by which the former agreed to pay Burns three dollars a day for each policeman detailed to suppress a strike that was then in progress by the men in Chesley's employ; and (4) a transaction in November, 1891, whereby Thomas Galligan paid Burns $100 after the defendant had threatened to arrest his carts if they continued to drop dirt on the streets. The only other evidence there was bearing upon this question was that of Seagrist as to a conversation between him and the defendant some time in or after the year 1891.

The case was submitted to the jury upon the theory that it might consider those transactions for the purpose of establishing " a criminal agency " on the part of the defendant, and thus

render him a principal, under the provisions of section 29 of the Penal Code. The judge's charge was to the effect that, if they found or inferred from the evidence as to other transactions that there was a concert of action between Burns and the defendant in regard to them, they might then infer a like concert of action in respect to the crime charged in the indictment. Thus, the question is presented whether a person may be indicted and convicted as a principal for a crime he did not personally commit, by proving circumstances from which a jury might infer that he had been associated with another in other transactions or in the commission of other and different crimes, and then permitting the jury to infer from such other inferences that he was guilty of the crime for which he was tried. It is an elementary principle that the commission of one crime is not admissible in evidence to establish the guilt of a party of another. But, if the evidence is material and relevant to the issue, it is not inadmissible simply because it tends to prove the defendant guilty of another crime. Coleman v. People, 55 N. Y. 81; People v. Corbin, 56 id. 363 People v. Shulman, 80 id. 376, People v. Sharp, 107 id. 427; 14 N. E. 319; People v. Greenwall, 108 N. Y. 296; 15 N. E. 404; People v. Shea, 147 N. Y. 79; 41 N. E. 505; People v. McKane, 143 N. Y. 455; 38 N. E. 950; People v. Murphy, 135 N. Y. 450; 32 N. E. 138; Hope v. People, 83 N. Y. 418. The foregoing authorities not only establish the rule above stated, but also practically determine what exceptions there are to it.

There is, we think, a clear and important distinction between allowing evidence of the commission of another crime to show motive, intent, or guilty knowledge, or where the crime proved is an incident to, a part of, or leads up to, the crime with which a defendant is charged, and a case where the crime proved is entirely independent of, and disconnected with, the crime alleged in the indictment. We do not think the cases of People v. Mc-Kane, or Hester v. Com., 85 Pa. St. 139, are in conflict with the principle stated. The Hester Case is unlike the case at bar. There the people proved by direct evidence a conspiracy which included the offense for which the defendants were tried. In the case at bar the people endeavored to establish the existence of a criminal conspiracy by proof of other distinct and sepa-

rate transactions. It is possible that the prosecution was properly allowed to introduce evidence as to the commission of other similar offenses or of similar transrctions with Seagrist, as evidence that the defendant and Burns were engaged in the joint purpose of obtaining money from him illegally. But the prosecution was also permitted to prove by the witness Lincoln, who was the superintendent of Chesley, a contractor, that he had general charge of a new building upon which his employer was doing the carpenter work, and that he had about thirty men at work for him when a strike occurred; that a number of years prior to February, 1890, he had known a man on the police force named McLaugdlin, who was a detective, and had occasionally seen him afterwards, but he could not say that he had been introduced to him, nor could he identify the defendant as the man; and that, about a week after the strike began, he met James Burns on the sidewalk. He was then asked to give his conversation with James Burns on that occasion. This was objected to; the objection was overruled; and the defendant excepted. Omitting that part of the evidence of the witness which did not fall within the defendant's objection, it was practically as follows: "I told James Burns I had seen Michael Burns, and had some conversation with him, and he referred me to the captain. * * * I told him that we wanted some protection there for the men; that we could get men to go to work if we could have protection. He told me to go and see the captain. He gave me to understand that he could do nothing himself until I had seen the captain. I went and saw the captain. First precinct, near the foot of Beaver street. I don't know as it was the captain. I knew McLaughlin by sight. I wouldn't swear it was him I saw there. I wouldn't swear to that. I saw some one there. I wouldn't swear that I saw the captain there. It is five years ago. I have known McLaughlin — at least, the man I supposed was McLaughlin — for the last eight or ten years. I wouldn't swear that I saw McLaughlin in the station house that day I went there. I know a man that I supposed was McLaughlin. I couldn't swear that I saw him in the station house when I went down there." The witness was then examined by the prosecution as to the contents of an affidavit he had previously made, to which the

defendant objected. The court overruled the objection, and the defendant excepted. In answer to the question relating to the affidavit, he testified practically as follows : " I made a statement that I knew a Captain McLaughlin, but I don't know as I do know him. I don't know whether it is this Captain McLaughlin. That statement was true when I made it. Right away, after I had this conversation with James Burns, I went down to the station house. I asked for the captain. I went to the sergeant's desk. He referred me to the captain's room. I went in there. I did not see the man inside there whom I had supposed to be Captain McLaughlin from my previous acquaintance. I was told it was the captain. I am not pssitive that was the same Mc-Laughlin with whom I had been on speaking terms. I think it was. I think he had no uniform on, the man I saw there. I don't think he had any coat on." He was then asked : " Now tell us what took place." ' This was objected to, as incompetent and inadmissible, upon the ground it was not proved that the defendant was there on that occasion, or the man whom he saw was the defendant. This objection was overruled, and the defendant excepted. The witness answered : " I told him what I was there for, and who sent me there, and he referred me back to Burns. I told him I was ovor there for men for the strikers. I told him Burns had sent me there. I think I told him, in substance, that I had a conversation with James Burns. I told him we wanted protection there. I will give the exact words as near as I can. I told him we were having trouble at the building, and wanted some help there, and I had seen Mr. Burns, and he referred me to him. He said : ' You go back, and see Burns. Whatever arrangements he makes is all right.' That is all the conversation I had with him. * * * I went back towards the building. I met James Burns between the station house and the building, at the Morris building, on Beaver street, about halfway. I had a conversation with him. I can give the substance of it." He was then asked to give the conversation. This was objected to, over-ruled, and an exception taken by the defendant. The witness answered : " I met him, and I told nim that I had been down to the station house, and he was to fix it. I think I told him that I had seen the captain. * * * He fixed it. He sent up six

or seven men there. I don't know just how many at the time. We had no more trouble. I mean that James Burns sent up six or seven policemen." He then testified: "I met Mr. Burns at the Morris building. He said he could hire men there at the rate of three dollars a day, all we wanted. I told him the thing was pretty hard; I would have to see Mr. Chesley first. The terms were finally made at three dollars a day for each policeman." This evidence was called to the attention of the jury in the charge of the judge, and submitted to them as evidence which might be considered upon the question of the defendant's guilt of the crime charged The court also permitted the witness Galligan to testify to a conversation which occurred in November, 1891, between himself and the defendant, and also a transaction which occurred between himself and Burns. He testified: "I believe Burns said something about dirtying the streets, and that the captain wanted to see me at the station honse, and I had better go down. I went down with Burns to the station house, and, when I went in on the floor, the captain was standing there, and Burns said to the captain: 'Here is the man that is digging out at the corner of Fulton and Nassau streets.' Then the captain said to me: 'Do you think you can come down to this precinct and do as you please?' I said: 'No; I do not intend to come down and do as I please. What do you mean?' He said: 'You came down here, and you filled up Burling Slip with that old rubbish in your building, and I have had all the merchants and everybody pounding me and running in here. I will arrest every cart of yours that scatters any dirt on the street. I will lock them up.' Then we had it pretty hot there, right and left, on the floor. I can't remember the conversation. I went out, and met Burns on the street. Then we walked along to Fulton street, back again to the job, and Burns asked me what I was going to do about it. I said I was going to headquarters, and see if he could interfere with me in that way. Then he said: 'What are you going to do that for? I can make that all right,—fix it all right.' I asked if $50 would do it. He said: 'No, make it $100.' Then I said I would see him next day. I left Burns at Fulton street, and started to go to headquarters. I met somebody on the way. I can't remember now who it was. I had a conversation with him with reference to

the conversation I had had down town. Next day I met Burns. Then I gave him $50. I paid him two sums of $50. After that there were no further complaints." All this evidence was taken subject to the defendant's objection and exception. On the cross-examination, the witness testified : "I do not mean that Captain McLaughlin made any demand on me for any money ; nothing of the kind from him ; no intimation of anything of the kind. The captain said merchants had been finding. fault; that I was not to be allowed to scatter dirt upon the streets from my carts. I know it is a rule or ordinance here that carts are not permitted to drop dirt in the streets. I guess the captain meant to require me to obey the laws and ordinances in that respect. I did not see or observe anything showing that the captain had any knowledge of this demand that Burns made upon me. Burns did not ask me to pay anything for Captain McLaughlin. He did not mention his name in connection with it."

At the close of the people's case, the defendant moved to strike out this testimony. The motion was denied, and the defendant excepted. This evidence was also submitted to the jury as evidence bearing upon the question of a conspiracy or joint action between the defendant and Burns, and to show that, under section 29 of the Penal Code, the defendant was guilty of the crime charged in the indictment, although the money was not paid to him, but to Burns. The charge in that respect was excepted to, and there were many other exceptions to the admission of the evidence, and to the language employed by the judge in charging the jury upon this subject, which cannot be examined in detail within the proper limits of this opinion. It will be seen from an examination of the evidence set forth that the people was permitted, not only to show Burns' participation in these transactions, but also to prove other transactions between Seagrist and the defendant personally, all of which was admitted under the defendant's objections and exceptions.

The charge of the learned trial judge seems to indicate that he entertained. the opinion that what he denominated "criminal agency" could be established in the same way, and by the same species of evidence, as may be employed in a civil action to establish the relation of principal and agent in favor of third persons.

We think no such rule exists. We find no principal of criminal law which recognizes the relation of principal and agent in the sense in which the term is used in reference to business or commercial transactions. ˈIt is true that in civil actions upon contract the course of dealing between parties may be proved to establish a general agency, but that principle has no place in criminal jurisprudence. From such evidence in civil actions a presumption is raised that the relation shown to exist in other transactions continues, or an estoppel is created which prevents the principal from denying the agency, and hence is presumptive or conclusive evidence of that fact. No such presumption or estoppel arises in a criminal case. There the presumption is of innocence, and the doctrine of estoppel has no application. Manifestly, this evidence was not admitted to prove guilty knowledge, intent, motive, or notice; nor did the transactions thus proved have any relation to or connection with the transaction upon which the indictment was based. They were entirely distinct and separate, had with other persons, at other times, under different circumstances, and constituted different crimes. They formed no link in the chain of circumstances or facts which led up to the transaction involved, and were no part of it. We think this evidence did not fall within any exception to the general rule, and was therefore improperly received. Without further discussion of this question, we are of the opinion that the evidence as to other transactions in the instances to which we have specially referred was improper, and that the court erred in admitting it, and charging the jury that it might take it into consideration in determining the guilt or innocence of the defendant.

On the trial, after the witness Seagrist had testified as to the transaction which took place between him and the defendant, and stated that it was upon Saturday, November 21, 1891, and two other papers had been admitted in evidence to show that that was the date of its occurrence, the court permitted the people to read in evidence a memorandum taken from the cash book of the witness, which was as follows: "November 21, 1891. Material. Paid to McLaughlin for protection, per Sergeant Burns, ordinance officer, $50;" and thereupon the book was exhibited to the jury. The witness could tell neither from his recollection nor from this

memorandum whether the $50 referred to was paid to the defend
ant, or whether it was paid to Burns.   This book was submitted
to the jury as proof in the case, not to establish time, but as inde-
pendent evidence of the matters stated therein.   An original entry
or a memorandum made by a witness at the time of a transaction
is admissible in evidence, as auxiliary to his testimony, only
when without its aid he is unable to distinctly recollect the fact to
which it relates.   The evidence is admitted only as a matter of
necessity.   Where the witness has a distinct recollection of the
essential facts to which the entry relates, so that primary com-
mon-law proof may be furnished, the necessity for secondary evi-
dence does not arise, and it is incompetent.   Bank v. Madden, 114
N. Y. 280, 21 N. E. 408 ;  Bank of Monroe v. Culver, 2 Hill, 531 ;.
Cole v. Jessup, 10 N. Y. 96 ;  Halsey v. Sinsebaugh, 15 N. Y. 485;
Russell v. Railroad Co., 17 N. Y. 134;  Guy v. Mead, 22 N. Y.
462;  Squires v. Abbott, 61 N. Y. 530, 535;  Howard v. Mc-
Donough, 77 N. Y. 592;  Peck v. Valentine, 94 N. Y. 569.
Mayor, etc., v. Second Ave. R. Co., 102 N. Y. 572, 580, 7 N. E.
905;  Brown v. Jones, 46 Barb. 400;  Meacham v. Pell, 51 Barb.
65;  Kennedy v. Railroad Co., 67 Barb. 169, 182.   Applying to
this question the rule established by the cases cited, it is quite ob-
vious that the court erred in admitting this evidence.   It is true
the witness was unable to testify whether he paid the $50 to the
defendant, or whether he paid it to Burns.   That was the only
part of the transaction that he testified he was unable to remem-
ber.   The question put to him was, " Have you no memory now,
even after looking at that, as to the precise person to whom you
paid it ? " to which he replied he had not.   The question was not
asked as to his memory, after looking at the memorandum, as to
the facts that were stated therein, or as to the time when the trans-
action occurred.   Without further proof that the witness could
not recollect the matters stated in this memorandum, it was re-
ceived as primary evidence or evidence in chief, under the defend-
ant's objection and exception. . The memorandum was as ambig-
uous and uncertain as the evidence of the witness, so far as it
related to that portion of the transaction in regard to which the
witness was unable to testify.   No person, by reading the memo-
randum, can say that it shows that the money was actually paid

to the defendant, nor that it was actually paid to Burns. It was only as to that fact that it was at all admissible. There is no claim or pretense that as to any other portion of the transaction the recollection of the witness was at fault. The effect, then, of this ruling, was to admit in evidence a memorandum in no way establishing the fact as to which the witness could not recollect, but which tended to prejudice the defendant by reason of a statement, not of what transpired between the witness and the defendant, or the witness and Burns, but the witness' purpose in paying the money. The statement, "Paid to Captain McLaughlin for protection," may have been received by the jury as evidence that the witness paid the money to McLaughlin, and that he paid it for protection, although it found no other sufficient proof of it. Such a memorandum, if admissible, could be received only as evidence of the facts stated therein, and not as to the conclusions it contained. This memorandum contains what must have been the conclusion of the witness that the payment, if made to Burns, was a payment to McLaughlin for his protection, or if it was a payment to McLaughlin that it was for his protection by Burns. Had there been no lapse in the memory of the witness, he could not have been properly permitted to state more than the facts. He could not have testified that he paid the money to Burns for McLaughlin, or that he paid money to McLaughlin for protection by Burns. He could only have testified to what was said or done. A memorandum made by a witness cannot be admitted to prove the conclusions of the witness, his purpose, or the object of another person. It is admissible only so far as it states facts as to which the memory of the witness has failed. Any other rule would be fraught with great danger, and could result only in injustice and evil consequences. We think this evidence was clearly inadmissible, and that the question was fairly raised by the defendant's objections and exceptions.

There are many other exceptions in this case which present questions-both interesting and important, but it is quite impossible, within the limits to which this opinion should be confined, to discuss them all. As the attention of the parties has already been called to them by the arguments and briefs of counsel which have been made and submitted upon the appeals in this case, presum-

ably any errors presented by these exceptions will be avoided upon a retrial, and no further discussion of them at this time is deemed necessary.

These considerations lead to the conclusion that the order appealed from should be modified by providing that all proceedings after the motion papers to change the place of trial and the stay granted by Judge Pratt were served, be set aside, including the trial and judgment, and judgment of the appellant division affirming the judgment of conviction; and that the defendant have leave to renew his application for a change of the place of trial upon the papers already served, and such additional papers as he may serve at least ten days before the time for the hearing of such motion; and that such motion may be brought to a hearing before a special term held in and for the city and county of New York upon ten days' notice by either party; that the stay be continued until the hearing and determination of such application; and, as so modified, that the order be affirmed; and that the judgment appealed from and the judgment of conviction be reversed, and a new trial granted. All concur, except that, as to the admissibility of evidence of other transactions, ANDREWS, C. J., and BARTLETT and VANN, JJ., express no opinion; and GRAY, J., dissents, except as to the sufficiency of indictment.