(36 Misc. Rep. 71.)

### PEOPLE v. DIAMOND.

(Supreme Court, Special Term, New York County. October 7, 1901.)

CHANGE OF VENUE—LOCAL PREJUDICE.

> Under Code Cr. Proc. § 344, authorizing the removal of a trial from the supreme court, a county court, or a city court to a term of the supreme court held in another county on the ground that an impartial trial cannot be had where the indictment is pending, that the police department of the city, and particularly the high officers and the captains and their wardmen, have been violently attacked by associations of citizens, aided by the local press, which denunciations have centered on a police captain indicted for willful failure to suppress a vicious resort in his precinct by reason of the conviction of one of his wardmen for accepting a bribe from the proprietress of such a resort, warrants the removal of the trial of such indictment to another county.

Thomas J. Diamond, a captain of police, was indicted for willfully neglecting to suppress a vicious resort within his precinct in New York City, and makes application for change of venue. Granted.

Eugene A. Philbin, Dist. Atty., and Howard J. Gans and Edward Sandford, Dep. Asst. Dist. Attys., for the People.

I. Rider Cady, Frederick B. House, and Louis J. Vorhaus (Henry C. Henderson, of counsel), for defendant.

GIEGERICH, J. The defendant, a captain of police, has been indicted upon the charge of willfully neglecting to suppress a disorderly house within his precinct in the city of New York, and he makes this application for the removal of the trial of the action from the court of general sessions of the peace in and for the city and county of New York "to the supreme court of the state of New York

in another county of said state, to be selected by the supreme court as a county where a fair and impartial trial thereof can be had, and to have the said indictment in the criminal action founded thereon removed from the said court of general sessions of the peace in and for the city and county of New York to the supreme court upon the ground that novel, intricate, and important questions of law are likely to arise upon the trial." In support of the motion for a change of venue it appears clearly from the affidavits and the exhibits submitted that during the past year the present administration of the police department of the city of New York, and particularly higher officers and the captains and their assistants known as "wardmen," have been most violently attacked by certain associations of citizens, the attack being aided by denunciatory articles contained in practically the entire local press. Of late, and during the past two months, this systematic denunciation has become more centered upon the defendant by reason of the prosecution and conviction of one George Bissert, the defendant's so-called wardman, upon the charge of accepting a bribe from the proprietress of a disorderly house within the defendant's precinct, for the alleged failure to suppress which the latter has been indicted. Following Bissert's conviction, the reports and editorials contained in all the leading newspapers have directed public attention not merely to the probability, but to the assumed certainty, that this defendant received all or most of the bribe mentioned and other bribes charged to have been given to Bissert, and that his neglect to suppress disorderly houses was due to such bribe taking. Furthermore, campaign literature lately distributed by a political body of very considerable activity and influence has proclaimed the defendant's guilt as an established fact of general public acceptance. The belief, or perhaps conviction, that the police officials are constant and systematic bribe takers, and for that reason willfully neglect to suppress unlawful places, was voiced in no mistakable terms by the district attorney in the course of his conduct of the Bissert trial; and such utterances, which were widely reported, cannot but have had their effect in forming popular opinion upon the prosecution yet to come, if that opinion has not already taken fixed form. Further evidence of the widespread character and strength of the sentiment on this point is found in the fact that the management and conduct of the police department have been made one, and in the eyes of many the chief, issue of a political campaign which is just now approaching its height, and which is appealing to the feelings of the people in a marked degree. Not only political, but also prominent religious and commercial, bodies and organizations have interested themselves and taken action in the matter. So far as the defendant's relation to this public excitement is concerned, it is hardly necessary to point out the intimate connection and virtual identity in the public mind between the offense of which Bissert was convicted and the offense of which the defendant is accused. Taking bribes from keepers of unlawful places, and neglecting to suppress them, are, in the public mind, and properly so, regarded as cause and effect or different aspects of one and the same thing. Whatever can be said, therefore, of the one offense can be said equally of the other. It is apparent, there-

fore, that the public bias, so far as this defendant is concerned, is against him for the alleged failure to suppress the disorderly house to the same degree as for the imputed participation in the more serious offense of bribe taking. In fact it is impossible to avoid the conclusion that the trial of Bissert was accepted and regarded by the public as a trial of the defendant, as well as the officers generally of the police department. This is not a case where the application is based upon the mere opinion of the affiant that public prejudice exists. The existence of that prejudice is a matter of obvious and necessary inference from the facts which have been presented, and the extent of the apparent public bias involves much more than a suspicion of this defendant's guilt. The statute provides for a removal of the trial as follows:

"A criminal action, prosecuted by indictment, may at any time before trial, on the application of the defendant, be removed from the court in which it is pending, as provided in this chapter, in the following cases: 1. From a county court or a city court to a term of the supreme court held in the same county, for good cause shown. 2. From the supreme court, or a county court, or a city court, to a term of the supreme court held in another county, on the ground that a fair and impartial trial cannot be had in the county or city where the indictment is pending." Code Cr. Proc. § 344.

The standard of fairness which the law contemplates has been often judicially declared. "The fairness of a trial should be above and beyond suspicion, and no court should allow a trial by a jury of a vicinage the general opinion and belief of which, upon the matters involved in such a trial, either party has industriously, through newspapers, sought to form. To do this would simply encourage parties, in advance of actual trial, to create prejudice and bias, in the hope of benefit to follow from a legal investigation before men, some of whom, at least, might have obtained their views and judgments of a cause elsewhere than in the court room." Moulton v. Beecher, 52 How. Prac. 186. The possibility of selecting a jury in the county which would be apparently unprejudiced is not the test of such an application as this, for where there is a general sentiment adverse to the party on trial, and a strong probability that bias exists throughout the community, he should not be compelled to take the risk of coming before a jury whose members, or some of whom, are influenced by adverse sentiments which may be undiscovered in the course of examination, or which, indeed, may be not fully appreciated by the jurors themselves. See People v. Webb, 1 Hill, 179. Although support may be found in certain of the earlier decisions in this state for the proposition that before such an application as this should be granted the impossibility of obtaining a jury should be demonstrated by an actual attempt and failure to obtain one (Bowman v. Ely, 2 Wend. 250; Messenger v. Holmes, 12 Wend. 203), the later and better decisions repudiate it (People v. Webb, supra; People v. Railroad Co., 16 How. Prac. 106; Budge v. Northam, 20 How. Prac. 248; People v. McLaughlin, 150 N. Y. 365, 380, 44 N. E. 1017). Indeed, the obtaining of a jury apparently impartial would seem to be the very danger against which this provision of the statute is intended to shield a defendant. Against obvious prejudice, such as can be made to appear upon the record, courts can protect; but this statute

is designed to protect against that other prejudice which is the more
dangerous because unconscious and not capable of discovery.    As
was said by Cowan, J., sitting with Nelson, C. J., in People v. Webb,
supra, at page 184:

"To make such an experiment essential would seem to be quite dangerous.
It [the trial] is the very thing which the law seeks to avoid when it is seen
that the party may, and probably will, be drawn into a trial by a jury, who,
under an influence of which they may themselves be hardly conscious,—an
influence which perhaps no human sagacity can detect,—may pronounce a
verdict against him, and conclude his rights forever.    Above all would it be
dangerous to require that he should risk his trial by a panel selected from
a community already sought to be influenced by the course of the press;
that very panel being personally appealed to by the opposite party's own
press, or one put in motion by him, or by some other person."

This language was quoted with approval by the court of appeals
in People v. McLaughlin, 150 N. Y. 365, 379, 44 N. E. 1017, 1021, in
which case the court further said on this point:

"That jurors are sometimes prejudiced, and courts may be unconsciously
biased to the injury of one of the parties, must be admitted.    Prejudice is
often an insuperable barrier to the fair and impartial administration of the
law.    Its influence is subtle, insidious, and often unconsciously warps the
judgment and blinds the intelligence of those surrounded by its atmosphere.
But its presence can usually be discovered only from the circumstances and
conditions which produce it."

In reaching my conclusion I have not overlooked any of the argu-
ments advanced by the district attorney against granting the applica-
tion.    One of these arguments is that the refusal of the grand jury
recently to indict a sergeant of police on the charge of murder in a
case where the district attorney felt the evidence demanded an indict-
ment is "conclusive evidence of an entire lack of passion or sentiment
in the community, or of any tendency on the part of the representa-
tive members thereof to deny a police official accused of crime the
benefit of any reasonable doubt."    To my mind, this circumstance is
wholly immaterial on the point in issue.    There is no public agitation
on the subject of police murders, or police burglaries, or any other
alleged offense save only the one of accepting bribes to leave vicious
resorts unmolested.    Another of these arguments is that the ease
with which a jury, claimed to have been unbiased, was obtained on
the Bissert trial, shows that the same can be done in this case.    The
answer of the defendant's counsel to this contention is that questions
tending to show bias were excluded in that case, such as the follow-
ing:

"Q. Have you any prejudice against the police force of the city of New
York?    Q. Do you know an association or institution of this city known as
the 'City Vigilance League'?    Q. Do you know an association or institution
of this city known as the 'Good Government Club'?    Q. Do you know of an
association—a voluntary association—of this city of some gentlemen com-
monly known as the 'Committee of Fifteen'?    Q. Have you any prejudice
against the police department as a department?    Q. Have you any prejudice,
or has any prejudice been engendered in your mind by your reading, or by
what you have heard against Captain Diamond of the officers in his pre-
cinct?    Q. Are you a member of the Committee of Fifteen?    Q. Did you
contribute to or support the so-called Committee of Fifteen?    Q. If it should
appear in this case that this prosecution has been instigated against this
individual defendant in order to secure and bring about political prejudice

*against the police department, would that operate to prejudice your mind against this defendant?"*

But, even if it appeared in the Bissert trial that inquiries had been allowed which were calculated to disclose facts from which bias could be inferred, and no such facts had been disclosed, then it would only be demonstrated that a jury could be obtained that was apparently free from bias. But this, under the principle stated in People v. Mc-Laughlin, supra, and People v. Webb, supra, is the precise thing to be guarded against. The bias which is so dangerous, in the language of the Webb Case, is that "of which they [who are under its influence] may themselves be hardly conscious," and "which no human sagacity can detect," and, in the language of the McLaughlin Case, which "can usually be discovered only from the circumstances and conditions which produce it." If, therefore, there exist at the present time in this community,—as I am satisfied there do,—"the circumstances and conditions which produce" bias, and which, moreover, are the only sure means of discovering its presence, it is obvious that such presence could not be detected by the ordinary tests, and that the failure of such tests would show not that the bias does not exist, but only that it is of that subtle and insidious character which evades such tests, and unconsciously warps the sentiment and judgment of those in its atmosphere. As has been so often said by judges before, under similar circumstances, of other localities (see People v. Railroad Co., supra, at page 113; Budge v. Northam, supra, at page 254), the granting of this application for a change of venue involves not the slightest reflection upon the general impartiality of the citizens of this county. This ancient privilege of a defendant, which has been preserved and defined by statute, is one based upon centuries of experience of human nature as it is found to act under certain conditions. This provision no more reflects upon the integrity and honesty of people than does any other safeguard of the law. It simply recognizes human nature as it exists, and makes provision accordingly. Just as the statute itself is no reflection, so the application of it, and action under it when the facts warrant, are no reflection upon the community. Whether guilty or innocent, the defendant is entitled to be tried in a vicinage not charged with the strong popular sentiment, whether well or ill founded, which here exists. As was said by the court in the McLaughlin Case, at page 375, 150 N. Y., and page 1019, 44 N. E.:

"The right of every person accused of crime to have a fair and impartial trial before an unbiased court and an unprejudiced jury is a fundamental principle of criminal jurisprudence. For the protection of persons accused of crime, the law, as a safeguard against local prejudice, has benignly provided this remedy."

There is one other consideration on this branch of the case which I am led to advert to by the following pertinent observation made by S. B. Strong, J., in People v. Baker, 3 Parker, Cr. R. 181, 195:

"During an experience of many years I do not remember a verdict in a criminal case in opposition to a strong public sentiment previously entertained and generally known. If that should be erroneous,—and it sometimes is,—it will probably lead to an unjust verdict. If there should be a divided

sentiment, it would result in a disagreement, and the trial thus prove abortive."

So, if the trial of this defendant should take place in this county, the jury might be made up of men who had prejudged the case against him or in his favor, or partly of each class, and the result might be an unjust conviction, or an unwarranted acquittal, or a disagreement. If the defendant's attorney intends by this motion, the language of which is quoted above, to move under subdivision 1 of section 344, Code Cr. Proc., as well as under subdivision 2, it is plain from an examination of the section that he cannot have a decision in his favor under both subdivisions. Subdivision 1 provides for a removal to "a term of the supreme court held in the same county"; subdivision 2 for a removal to "a term of the supreme court held in another county." It is true that the ground in the one case is "for good cause shown," while that in the other is for the specific ground that "a fair and impartial trial cannot be had," and that a defendant whose motion on the latter ground has been denied would still be entitled to a decision on the former and more general ground. But, as I grant this motion on the ground stated in subdivision 2, there is no necessity for any discussion of the case under subdivision 1. As above stated, I am satisfied that the conditions exist in this county, where the indictment is pending, which are contemplated by the statute under which this motion is made, and therefore that the defendant is entitled to a trial in some other county, where similar conditions do not exist. The place of trial will be designated in the order to be entered hereon. If the parties agree upon any county, I shall designate it; if not, I shall make a selection after hearing both sides upon the settlement of the order on two days' notice.